UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| VERONICA ESCOBAR, U.S. Representative of the 16th congressional district of Texas,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas,<br><br>*Defendants*. | § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>3:22-CV-00022 |

PLAINTIFF'S ORIGINAL COMPLAINT

### I. Introduction

1. El Paso is unique among Texas counties: it is bilingual, bi-national, multi-cultural, and geographically distinct. For instance, El Paso has over 800,000 residents, is over 82% Hispanic and over 25% of its residents are foreign born. It is the largest border city in the United States, and one of the safest communities in the nation, leading the country in public safety. El Paso takes great pride in protecting all its residents and its values, and has been a leader in the fight against discrimination of all types for decades. El Paso is also a military community. Since the middle of the 19th Century, Fort Bliss has called El Paso home. Today, Fort Bliss is the home to the 1st Armored Division and to thousands of U.S. Army soldiers, officers, and their families. Fort Bliss is the single largest employer in the area supporting a total of 167,358 people with an

1

estimated annual contribution of approximately $25.6 billion. For more than 150 years, the fate of El Paso and Ft. Bliss have been entwined. Fort Bliss and El Paso are one community working together for the safety and prosperity of all that live there.

2. Today, the safety and prosperity of both Ft. Bliss and El Paso is threatened by racially discriminatory congressional maps. In September and October of 2021, the Texas Legislature adopted Senate Bill 6 ("SB 6"), which reapportioned Texas' delegation to the U.S. House of Representatives. SB 6 violates federal law and the U.S. Constitution in several ways and throughout Texas. However, most egregiously, SB 6 makes the inexplicable policy choice to remove Ft. Bliss from El Paso and connect it to a congressional district 500 miles away in San Antonio. This choice defies logic and is intentional discriminatory. SB 6 must be enjoined.

## II. Jurisdiction & Venue

3. Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. §§ 10301 and 10304. Jurisdiction for Plaintiffs' claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202. Jurisdiction for Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Jurisdiction for Plaintiffs' claim for costs and attorney's fees is based upon 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). Venue is proper in this Court under 28 U.S.C. 1391(b) (2) because a substantial part of the events and omissions giving rise to the claims in this case occurred in the Western District of Texas and in El Paso County. Plaintiff requests a three-judge panel pursuant to 28 U.S.C. § 2284.

## III. Parties

4. Plaintiff Veronica Escobar is the current U.S. Representative for Congressional District 16 (CD 16). She is a registered voter in CD 16 and will vote in future elections in CD 16, including the swiftly approaching 2022 Democratic primary election. She is injured by SB 6, because of the intentionally discriminatory choice to remove Ft. Bliss from CD 16, as the current congresswoman and as a registered voter in El Paso County. She may be served by and through her counsel in this matter.

5. Defendant Gregory ("Greg") Abbott is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. He is sued in his official capacity.

6. Defendant John Scott is the Secretary of State of Texas. He is the chief election officer of the State of Texas and is currently responsible for administering and implementing the election laws in Texas, including SB 6. He is sued in his official capacity.

**IV. Facts**

7. Ft. Bliss has been in CD 16 since the creation of CD 16 in 1902.

**Texas Congressional Districts in 1902**

8. This changed in 1992. From 1992 into 2000, Ft. Bliss was split between CD 23 and CD 16, with most of the land area of Ft. Bliss placed into CD 23.

**Close-up of CD 16 & CD 23 in 1992 Congressional Plan**



9. After the split, in 1995, the Department of Defense recommended that the U.S. 3rd Armored Cavalry Regiment be relocated to Fort Carson, Colorado. Efforts to consolidate units from another post with those units that remained at Fort Bliss were overruled by the Base Realignment and Closing Commission, leaving Fort Bliss without any armored vehicle divisions.

10. This put the military mission of Ft. Bliss in danger, devastated the local economy and threatened the livelihood of thousands of El Pasoans.

11. This mistake was rectified in future congressional maps, which ensured that all or most of Ft. Bliss was connected to its hometown congressional representative.

4

12. In SB 6, Ft. Bliss has been almost completely severed from El Paso and its congressional representative in CD 16.

**CD 16 & CD 23 in the 2020 Congressional Plan**



13. CD 16 in the benchmark contained the entirety of Ft. Bliss.

14. After the publication of the U.S. Census, the baseline population of CD 16 was 757,362. The ideal population of a congressional district according to the U.S. Census is 766,987. In order to comply with the "one person, one vote" principle of the 14th Amendment, CD 16 only required the addition of a 9,625 people.

15. Instead of adding a few Voter Tabulation Districts (VTDs), the State of Texas engaged in a racial gerrymander that radically altered the border between CD 16 and CD 23 to detriment of El Pasoans and Latino Voters in both congressional districts.

16. In sum, thousands of El Paso County residents were moved into and out of CD 16 in order to accomplish a racial gerrymander that will prevent Latino voters in CD 23 from electing their preferred candidate and remove a critical community of interest from El Paso.

17. The removal of critical communities of interest like Ft. Bliss from CD 16 is an act of intentional discrimination.

18. The configuration of the border of CD 23 and CD 16 in El Paso County divides El Paso communities and VTDs along racial lines. Racial discrimination predominated the making of these policy choices.

19. CD 23 has long been the focus of federal litigation. In the last round of redistricting, CD 23 boundaries were challenged as violating federal law and the U.S. Constitution. CD 23's configuration as enacted by the State of Texas was eventually denied pre-clearance and enjoined.

20. In the decade before that, the configuration of CD 23 was also challenged. Eventually, the U.S. Supreme Court said that the CD 23 violated federal law.

21. District 23 in both the 2011 and 2003 Congressional plans violated the Voting Rights Act. By eliminating a Latino electoral opportunity for the third time in three decades, Texas has demonstrated a recalcitrant refusal to recognize the rights of Latino voters in this West Texas.

22. In 2006, the Supreme Court addressed a Section 2 challenge to the 2003 configuration of District 23. In doing so, the Court stated that the State's actions bore "the mark of intentional discrimination that could give rise to an equal protection violation." *LULAC v. Perry*, 548 U.S. 399, 440 (2006).

23. In 2012, a three-judge Court in Washington, D.C. found that although the version of District 23 created in 2006 as a remedy after *LULAC v. Perry* had provided Latino voters with the ability to elect their preferred candidates, the 2011 Congressional plan "took that ability away." *Texas v. United States*, 887 F. Supp. 2d 133, 154 (D.D.C. 2012) (three-judge court), *vacated*, 570 U.S. 928 (2013). A three-judge court in Texas subsequently found that the 2011 Congressional plan's "manipulation of Latino voter turnout and cohesion in [District] 23 denied Latino voters equal opportunity and had the intent and effect of diluting Latino voter opportunity." *Perez v. Abbott*, 253 F. Supp. 3d 864, 908 (W.D. Tex. 2017) (three-judge court) (2011 Congress).

24. In the benchmark plan, CD 23 is a Latino majority, swing district. It has a 63.2% Hispanic Citizenship Voting Age Percentage (HCVAP). CD 23 is both rural and urban. It is larger in land area than nearly every U.S. state east of the Mississippi river. It is also one of the focal points of federal voting rights challenges to Texas' congressional districts.

25. CD 23's political performance is marginal. It is a district that leans Republican, but has – at times – elected a Democrat. In the 2020 General Election, Trump won CD 23 with 50.2% of the Vote. Other statewide Republican candidates fared similarly. In 2018, Senator Cruz lost CD 23 to candidate Beto O'Rourke by 4 points (52.07% v. 47.11%). Some Republican statewide candidates won CD 23 and others lost. It's a swing district.

26. As currently configured, CD 23 is now only 57.8% HCVAP. The Spanish Surname Voter Registration (SSVR) has also decreased to below a majority 49.2%, and the Spanish Surname Turnout has been reduced to 42.9%.

27. As a result of the changes to CD 23, the political performance for minority preferred candidates has also been diminished. The Texas Legislative Council (TLC) estimates that the political performance for Anglo-preferred candidates has increased 2-4 points depending upon the election and candidate.

28. These policy choices were made deliberately and intentionally to dilute the voting strength of the minority community and to intentional discriminate against Latinos in CD 16 and CD 23.

29. Elections in CD 16 and CD 23 are racially polarized. In fact, elections throughout Texas are racially polarized.

30. Latinos are political cohesive in CD 16 and CD 23 and vote as a bloc for the Latino-preferred candidates.

31. In Texas and in CD 16 and CD 23, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In each of CD 23 and CD 16 and throughout Texas as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.

32. Texas has a despicable and regrettable history of racism. Congressional elections and the creation of congressional districts have also had a troubling history of segregation and racial conflict.

33. Throughout Texas, federal courts have found that the elections in Texas bear the taint of racial polarization. "Regardless of methodology…experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al*

8

*v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan C185).

34. "Hispanic voters are politically cohesive in general and primary elections. African-American voters are politically cohesive in general and primary elections. With the exception of Travis County, Anglo voters are politically cohesive in general elections in support of the Republican candidate, regardless of the candidate's race." *Id.* at ¶¶ 703, 704, and 707.

35. In the past decade, the State of Texas has instituted several barriers to minority participation that enhance minority vote dilution.

36. In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas was found to have intentionally racially discriminated against minority voters by enacting and in the enforcement of its Voter ID law.

37. Also in 2011, Texas enacted several redistricting plans many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. In addition, in the adoption of those plans, a three-judge panel found that Texas had intentionally discriminated against minority voters.

38. In the recent past, Texas instituted a voter purge of its voting rolls supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens. Texas settled these claims before a court could make a determination of Texas' intent in these matters.

39. In the last 90 days, Texas has enacted yet another voter disfranchisement bill, SB 1, which is aimed at the heart of the minority community that is currently being challenged in federal court.

40. In Texas, there is a strong and consistent correlation between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

41. Anglos in Texas have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos.

42. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level.

43. Latinos in Texas are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

44. There is a strong correlation between the inability to elect minority-preferred candidates and the socio-economic disparities experienced by Texas minorities.

45. Most of the socio-economic disparities experienced by all Texas Latinos are exacerbated in West Texas. Far East El Paso County, specifically the lower valley area, which is currently

in TX-23 is one of the poorest geographic areas in Texas. The median household income in this area is $33,452 and 23% of families in CD 23 that reside in El Paso County (Fabens, Clint, San Elizario, Socorro and Tornillo) live far below the poverty line.

46. In El Paso County, there are more than 150 *colonias*, subdivisions and neighborhoods that are substandard building developments that lack fundamental services like paved roads, street lights, and more importantly, water and wastewater. Most of these *colonias* are in profound need of federal investment, especially considering the limited resources available to local governments and the lack of investment from the State of Texas.

47. During the 117th Congress, for the first time in over a decade, Congress reinstated earmarks, an appropriations process eliminated years ago which allowed each member of Congress to select projects in his/her district that would receive direct federal funding. The appropriations process was significantly reformed, renamed (no longer called "earmarks," but renamed as "Community Project Funding") made more transparent and was intended to be community and district driven. This Community Project Funding affords members of Congress the opportunity to invest in areas of high need, like the lower valley of El Paso in CD 23. The new Community Project Funding process in the 117th Congress demonstrates where members' top priorities lie. In CD 23, because the portion of El Paso that is within CD 23 is so far from the flagship office of CD 23 (San Antonio) and represented by a member of Congress 500 miles away, this area was not a priority for the incumbent congressman in CD 23.

48. Rep. Tony Gonzales, the current incumbent for CD 23, requested $38,942,500 million in Community Project Funding investments. Despite the dire need for the low-income areas he represents in El Paso County, Rep. Gonzales requested only $798,000 for a project in the lower valley area of his district, one of the poorest in the state. In fact, most of his requested projects

11

were centered in and around the San Antonio area. The current incumbent has failed to respond to the needs of minorities throughout CD 23 and in El Paso County, specifically. Moving even more of El Paso County - especially Fort Bliss - into CD 23 would only serve to further disenfranchise those voters.

49. Texas elections are typified subtle and overt racial appeals. And, during the enactment of CD 16 and CD 23, stray comments were made about the incumbent representative of CD 16 that were racial, misogynistic, and revelatory of an impermissible intent in the creation of those congressional districts.

50. In Texas, Latino-preferred candidates for state office are rarely, if ever, successful.

51. The incumbent congressional representative of CD 16 is more responsive to the needs of taxpayers, voters, and employees of Ft. Bliss than a congressman elected out of San Antonio who has demonstrated that El Paso is low on his priority list.

52. The removal Ft. Bliss and other areas of El Paso County from CD 16 was done for an impermissible purpose.

53. There is no policy rationale that would justify the dissection and removal of Ft. Bliss from a congressional representative centered in El Paso.

54. The policy choice to dissect CD 16 and remove Ft. Bliss will have a disparate impact on minority communities.

55. The policy choice to racially gerrymander CD 23 in El Paso will have a disparate impact on minority communities.

56. The legal and historical background of SB 6 is fueled by an impermissible purpose.

57. The sequence of events leading up to the adoption of SB 6 was fueled by a racially discriminatory purpose, including deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment.

V.  **Causes of Action**

**Count 1 – Section 2 of the Voting Rights Act**

58. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

59. The adoption of SB 6 is an election change that results in a denial or abridgement of the right to vote of individual plaintiffs and organizational plaintiff's members on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their individual voting strength as minorities in Texas. This election change does not afford individual plaintiff and the voters of El Paso and CD 23 an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs and organizational plaintiff's members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301 *et seq*.

**Count 2- Equal Protection Clause of the 14th Amendment to the US. Constitution**

60. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

61. The choice by the State to Texas in adopting SB 6 is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis race and national origin in violation of 14th Amendment to the U.S. Constitution.

VI. **Request for Injunctive Relief**

62. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

63. Plaintiff will likely succeed on the merits, because SB 6 dilutes the votes of minority voters in CD 16 and CD 23 and violates federal and state law. The policy choice of the State of Texas to remove Ft. Bliss from CD 16 is an election change that nullifies the electoral voice of the minority voters of El Paso, including the plaintiff.

64. Plaintiff will suffer immediate and irreparable injury.

65. There is no harm to the State of Texas or the defendants from being prevented from administering election districts that violate federal law and the U.S. Constitution.

66. The injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based.

67. Plaintiffs have no other adequate, plain, or complete remedy at all other than enjoining the SB 6.

68. Plaintiffs request that the Court enter a permanent injunction prohibiting Defendants implementing any future elections held pursuant to SB 6.

## VII. Conclusion & Request for Relief

69. For the foregoing reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

   **A**. Appropriate preliminary and permanent injunctive relief to which it shows itself entitled;

   **B**. Entry of a declaratory judgment as described above;

   **C**. Attorneys' fees and court costs; and,

**D**. Any other or further relief, in law or equity that the Court determines that plaintiffs are entitled to receive.

**DATED**: January 12, 2022

Respectfully,

By: /s/ *Martin Golando*

The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia Ave.
San Antonio, Texas 78201
Office: (210) 471-1185
Fax: (210) 405-6772
Email: martin.golando@gmail.com

Attorney for Plaintiff